I'm going to put, please call, Carl Budig, the Carl IWCC. Carl Buddig & Co. v. Carl Burrow 117-0728, Carl Buddig & Co. v. Carl Burrow Counsel, you may proceed. Thank you. Good morning, Your Honors. May it please the Court, Counsel. My name is Nicole Russo, and I represent the appellant in this case, Carl Buddig. I'm going to keep my argument brief. I am presenting this case on appeal because my client believes that the manifest weight of the evidence supports that the expert testimony given by the employer's expert in injury biomechanics is the most credible evidence regarding the issues of accident and causation, and that, accordingly, the decision of the Commission should be reversed. In support of this argument, the record clearly documents the convincing credentials and testimony of the respondent's expert witness, Louis Draganich. Mr. Draganich testified that the alleged mechanism of injury could not have caused the L5S1 lumbar injury as alleged. The record also reflects that the manifest weight of the evidence also reflects that Mr. Draganich completed a master's and Ph.D. in bioengineering with a focus on biomechanics, and more importantly that his experience includes analyzing and applying mechanical engineering to the human musculoskeletal system. Further, Mr. Draganich testified that for over 20 years he taught orthopedic biomechanics, injury mechanics, including biomechanics. Can I ask you a question? Sure. What did Heller testify to? Dr. Heller testified that the injury resulted in a lumbar sprain strain and that at the time of her examination the claimant didn't require any further treatment. But he did acknowledge that the October 2012 MRI showed a large herniated disc. Dr. Heller, at the time of her examination, the MRI had not yet taken place and there was no evidence of any disc herniation until months later in October. But the October 2012 MRI, according to Heller, showed a herniation? Heller didn't. She acknowledged that the herniation was apparent from the MRI, but the MRI was not available or not performed or not done at the time of her examination. And what did Dr. Singh say? Dr. Singh did feel that the claimant did require surgery and that the herniation could have been caused by the work accident. And in response to that, our argument is that Dr. Singh wasn't in as good of a position as our expert who was able to specifically recreate the exact accident. There was some inconsistencies in the testimony from the claimant regarding the weights of the boxes, the heights, the number of boxes, the layers. And so it's our argument that the expert who testified on it could have. Granting you the fact that the MRI of October 2012 was not available when Heller examined the claimant in May of 2012, Heller did acknowledge that the claimant had, that the 2012 MRI showed a large herniated disc. So from whence came the herniation? So there were some alternate incidents that are documented in the treating records, and it's our theory that those were the cause of the herniated disc. What were they? A documented incident in the treating records where the claimant goes to his doctor and claims to be in extreme pain from carrying a 70-pound child to and from school. And he was taken off work contemporaneously with that office visit. There's a second incident where he goes back to his doctor, again, complaining of excruciating pain from setting up furniture and party tents and chairs for a party. And so it's Respondent's theory that those intervening incidents could have been or were the cause of the herniation that was seen immediately proximate to that. But the Commission did address that, correct? I mean, and so did Dr. Singh. I mean, the Commission said, as I understand it, look, he reported the accident immediately, the accident, the symptoms were present and corroborated by two other eyewitnesses. There was one eyewitness. An eyewitness. Sure. And they felt that his reports to the medical providers were consistent. Sometimes you get, as you know, these unwitnessed accidents and nobody knows anything. But that's not really the case here. There was an eyewitness that corroborated the claimant's version, correct? There was a witness who corroborated some of the details. There was a discrepancy regarding how many boxes were being moved. There was also witness testimony on behalf of the employer that said that it was against policy and it probably couldn't have even physically been done the way that it was described. There were eyewitness reports that also is inconsistent with the testimony that the claimant gave regarding how many boxes. Well, let's assume it was three or six. How does that square with the rule that we sometimes are cited that the employer takes the claimant as they find them? Well, that's where the expert testimony comes into play. There was evidence and specific measurements regarding the amount of force that would have been required to push the three levels versus the six levels. So are you suggesting this whole thing that he's malingering? That his testimony and the eyewitness and the immediate point of the accident had to be made out then. Yet if he's injured, pushing three boxes or six boxes is a reason not, right? Correct. That's really the central issue. The amount of boxes isn't the key here. It was the person injured. Correct. And again, it's our position that whether an injury occurred or not, which, I mean, it's our position that it didn't occur as alleged, but going to that point, our expert doctor testified that had the accident occurred as described, it resulted in a minor sprain strain and not the need for surgery. Okay. Counsel? Yeah, I read the rest of my brief regarding the remaining issues. I have a question. Oh, sure. Yes. When you prepare a reply brief, what documents or anything do you refer to? The information in the counsel's brief. Were you aware that the file brief is missing seven pages? No. My version isn't. It isn't? No. So did you have the file version? I do, yes. What pages, 10 through 16, are in the file of that brief? In counsel's brief? Yeah. You're the app one. They're the app brief. Yeah, I have pages 10 through 16. You do? Mm-hmm. Is that the file? I don't know. I believe this is the file copy. I don't know where it would have been stamped, but I believe this is the file copy. Yes. Well, we were missing pages 10 through 16. Okay. This was filed electronically. Correct. My copy only has four pages. I've got a printout from the electronic file copy. Okay. It's a printout from the computer. Okay. Yes, we were missing them, so we had to contact the app release to get copies. Okay. Sorry about that. They might want to, as practice, to be very careful because you have an opportunity to strike an app release brief. Okay. You missed it. Thank you. You'll have time to reply to us. Okay. Okay. Thank you. Counsel. Good morning. Not only late, but you were missing some pages in your brief. We had to contact you to get those pages. Yes, and I don't know what happened with that, Your Honor. We did electronically. Actually, I did it here, and it indicated that all the pages went through. I did get a call from a clerk in the 3rd District two weeks ago saying there were some missing pages, and I emailed it to her. It says the words of the wise. It's electronic filing now. Everybody has to be more careful because you're dealing with a new technology. Yes, I kind of was, and I actually didn't realize that the circuit court had gone over to e-filing, and I hit on it. All right. Well, there's going to be a lot of glitches in the system, and so it will be incumbent on all of us to be pretty careful. Yes. I didn't realize it. I actually went out and spent a lot of money, and they had briefs bound, and they had made all sorts of copies and lugged them over here only to find out. Well, some of us aren't happy with the new technology. This is the result of what happens. So it creates problems for all of us. Right. I did mail Counsel a copy of the brief. That's probably why she's not missing anything. I think she did receive it. Okay. But when we get electronic copies, that's all we've got. Right. It looks like something's awry. By the way, that will be changing, correct, this item? Yes. We have entered an order. This court has entered an order that we would have received your bound proofs. I appreciate that. Also be aware of that. Which, in this instance, would have saved us all effort. Yes, I appreciate that. I apologize to the court. There's no excuses for being late. I was on the blue line this morning. I got on at Jefferson Park, which is normally a 30-minute route down here, and there's an announcement that they had a problem with the rail at Logan Square and ended up sitting in the train. There are excuses, and that's probably a good excuse. Yes, I apologize. I take pride in being on time. Right. But those here in the city, so. Yes. Counsel, you may proceed if you state your name for the record. Yes. I'm sorry, Your Honor. Peter Luck is here on behalf of Ricardo Harrow, the appellee. The main issue in this case is whether or not Mr. Harrow sustained an accident. On February 6, 2012, the arbitrator who heard this case made a ruling that he did not prove that he sustained a compensable accident. She didn't get into other issues like causation and medical expenses and temporary total disability. So I'd like to focus on the issue of accident. The evidence in this case is overwhelming that this gentleman sustained an accident on February 6, 2012. He was lifting or pushing boxes from one pallet to another. Incident occurred at about 1130 at night. He testified that he waited about 10 minutes to see if the pain would go away before he reported it. Did he report it that night? He reported it that night. If you look at the initial supervisor's report, incident occurred at 1130 p.m. It was reported at 1140 p.m. Was it witnessed by anybody? It was witnessed by a co-worker, a gentleman by the name of Gustavo Macheco. There was an employee incident report filled out by him, which corroborates my client's testimony. You've got three reports. You have a supervisor's report, you've got an employee accident report, and you have a co-worker accident report. All three of them fairly consistent with the claimant's testimony in this case. The other corroborating evidence here is if you look at all the histories that were given to the providers, Ingalls, Occupational Health, Dr. Singh, Dr. Amini, Dr. Heller, they're all consistent with his testimony that he was pushing boxes of product from one pallet to another. They all included that he sustained an accident on February 6, 2012. We could argue about causation. Our jury didn't talk about it. Even Dr. Heller concluded that he sustained a mild back strain on February 6, 2012. Will you make then up a referral to his alleged intervening accidents, breaking a chain? Your Honor, she's talking about two incidents that happened in August and September of 2012. My client testified that he was putting up some chairs for a party tent, went to the doctor, told him about it. But if you look at the medical records, there were no tests ordered, and he was released to go back to work shortly thereafter. Similarly, with the intervening accident she's claiming on September 11, 2012, where he was lifting one of his kids, he said he noticed some back pain, told the doctor about it, was released to go back to work two days later. There were no tests ordered there either. So there's no evidence that his medical condition had changed. The other thing the counsel fails to tell you is she argues that he finally had an MRI in October of 2012 after these intervening accidents. But what she fails to tell you is that the clinic he initially went to, which was the employer's preferred clinic, had recommended MRIs on three occasions, February 2012, March of 2012, and again in March of 2012, which were denied by the employer. No specific reason for the denial. They didn't use utilization of review. They didn't have another doctor at that point say, well, he doesn't need an MRI. They just simply refused it. They then make the argument, well, he had the MRI in October of 2012 after these intervening accidents. Well, what about the recommendations from your own clinic back in February, March of 2012, recommending an MRI, which they refused to approve? If you look at this case, this is a typical case where somebody injures his low back and undergoes conservative treatment, physical therapy, pain medication, and is not approved. As a matter of fact, his symptoms change. He initially had low back pain, started complaining within a month or two of ridiculous symptoms into his buttocks, into his left leg. This is a situation where, obviously, conservative treatment didn't work. An MRI would have been appropriate back in February, March of 2012, which would have revealed this large herniated disc that he had at all five months ago. That's what Dr. Singh concluded, that Dr. Heller was wrong because he should have had an MRI in February and March, which would have shown the herniated disc. Just so you all are just as aware, Dr. Singh was a Section 12 independent medical examination. The employer sent a claimant to Dr. Singh. They never sent me a copy of the report. I had to subpoena the report. I then had to take a deposition of Dr. Singh in order to get the report into evidence. He's their doctor. He's highly qualified. He's an orthopedic surgeon. He operates on 500 to 600 people a year, and he's an excellent doctor. He's also got a degree in biochemical engineering, and he testified in his deposition that any analysis based on biochemical engineering he would not defer to and that there were a lot of problems with that type of analysis on these types of injuries. The commission noted when they looked at Mr. Draganich's report that you cannot really specifically precisely simulate a work injury, no matter how hard you try. You just simply can't do it. I'm not aware of any precedent in the workman's compensation field for this type of a report, this type of analysis. I think Mr. Draganich testified this was his first testimony before the Industrial Commission. Maybe this will be a new trend, but there's really no precedent for this type of evidence. I know he's qualified. He has more qualifications than me, but he's not a doctor. He's not an orthopedic surgeon, and I don't think it's really strong evidence with respect to this case. The other thing is his testimony, his analysis goes to causation. It does not go to accident. He didn't say that this gentleman didn't have an accident on February 6, 2012. He said he couldn't have irritated the disc based upon the exertion and the weights that were involved. If you look at this, David Spear came in and testified for the employer in this case to charge of safety. He testified that they had done an internal study on pushing and lifting of weights, and he had testified that when they studied three layers of boxes, that that could, in fact, be problematic. That could cause an injury, and they had recommended to their employees that they not push more than two layers of boxes. When Mr. Draganich did his evaluation, he used three layers of boxes, and he testified, and his report says there's not weight involved, not exertion involved to cause a disc herniation. It completely contradicts the study that was done internally by David Streeter. Now, the commission talks about David Streeter and basically said they thought the arbitrator in this case relied improperly on his testimony, and his testimony was not credible for a number of reasons. His actions were completely contrary to what he testified to. He said they had a 100% return to work program. No matter what the restrictions are, we take an employee back to work. Well, in this case, they did take my client back to work when he had restrictions. As a matter of fact, they paid him temporary total compensation. They would not have paid him temporary total compensation if, in fact, light duty was available in this case. So his testimony that they have a 100% return to work program, they accommodate any work restrictions, didn't apply in this particular case. Doesn't his case rise or fall on the question of the commission accepting Singh's causation opinion over that of Heller? What else is there in this case? His thoughts are out, but also the issue of accident, because the claim was initially denied by the arbitrator. Well, the fact of the matter is Heller didn't deny that there was accident. Heller only denied that the herniated disc was the result of the event. He said it was only a mild lumbar strain when she examined him in 2012. Singh gives a causation opinion that includes accident. So there's all sorts of evidence of accident. Accident is the issue in this case. That's a nonissue. The issue here is causation. Well, Your Honor, I think Singh is by far the best evidence you have here in this case in terms of his qualifications. Well, whether I find it to be the best evidence or not is irrelevant. The commission did. Right. But, I mean, nothing against Dr. Heller, but I believe she's an occupational medicine doctor. She's never operated on anybody, never contemplated surgery. So you have Dr. Singh, professor at Rush University, highly respected orthopedic surgeon, and you've got Dr. Heller. And you also have the fact that Dr. Heller didn't have an MRI, hadn't approved an MRI in March, February of 2012. I think her findings would have been different, because you would have told me this gentleman had a herniated disc. Unfortunately, she didn't have an MRI to look at because the respondent did not approve the MRI. With respect to the award of medical, we have testimony from Dr. Singh that the surgery performed by Dr. Ramini was reasonable, necessary. He's opined that this gentleman needs a fusion. And with respect to the award of the temporary total disability, 159 and two-sevenths weeks, there's testimony as to my client working for a period of time and going off of work. It's corroborated by the medical records. And I would ask the justices to please affirm the decision of the industrial commission. Thank you, counsel. Counsel, you may reply. Your Honors, I just want to briefly reiterate that, as, you know, discussed, there are disputed issues regarding accident, but that the main issue here is whether the incident described caused the condition requiring surgery and its response position that it did not and could not have caused the herniated disc requiring surgery. That's supported by the manifest way to the evidence, which includes the alternative incidents that immediately preceded the MRI findings and the expert testimony from Louis Dredd. Thank you. Thank you, counsel. Both your arguments in this matter will be taken under advisement with this position still issued. The court will stand adjourned.